(July 24, 1997)

**1** THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MALCOLM GREENIDGE, Also Known as KEITH COX, Appellant. [661 NYS2d 605] —Judgment, Supreme Court, New York County (Allen Alpert J.), rendered January 13, 1994, convicting defendant, upon his plea of guilty, of robbery in the second degree, and sentencing him, as a second violent felony offender, to a term of 5 to 10 years, is affirmed.

Defendant's motion to suppress physical evidence and a lineup identification was properly denied. Upon receiving a radio transmission, shortly after midnight, of a robbery with a gun, the police observed defendant and another man, who matched the general description contained in the transmission, running only three blocks from the location where the robbery had occurred. Defendant was clutching a jacket tightly under his arm as if he were concealing something underneath, and both men were sweating. These circumstances provided the police with, at the very least, a founded suspicion that criminality was afoot (*People v De Bour,* 40 NY2d 210, 223; *People v Esquilin,* 236 AD2d 245, *lv granted* 90 NY2d 857; *People v Salva,* 228 AD2d 334, *lv denied* 89 NY2d 867; *see also, People v Allen,* 73 NY2d 378). Upon seeing the police, defendant and his companion took evasive action by veering toward the street, clearly providing reasonable suspicion justifying their detention (*People v Martinez,* 80 NY2d 444, 448; *People v Leung,* 68 NY2d 734, 736-737; *People v Esquilin, supra; People v Li,* 238 AD2d 277). Further, upon feeling a "hard and basically squarish" bulge under the jacket defendant was wearing, and believing that "possibly there was a gun" inside, the police, given the nature of the crime reported (*see, People v Torres,* 239 AD2d 154), were justified in removing the object from defendant's coat (*People v Batista,* 88 NY2d 650; *People v Thompson,* 232 AD2d 267, *lv denied* 89 NY2d 947). Upon discovering that the object was a pouch, which defendant claimed to have "found", and upon feeling a weighty object inside that felt like it might be a gun, the police properly opened the pouch (*People v Thompson, supra; cf., People v Smith,* 216 AD2d 233, *lv denied*

87 NY2d 851). Under the circumstances, when the police saw that it contained photo identification belonging to someone else, they had probable cause to search the contents of the pouch, and arrest defendant (*People v De Bour*, 40 NY2d 210, 223, *supra; see, People v Furst*, 222 AD2d 299). The hearing court's factual findings as to the sequence of events are supported by the record and we decline to disturb them.

The court did not err in declining to suppress the evidence as a sanction for the People's failure to preserve the audiotape of the radio transmission. We have considered defendant's other claims and find them to be without merit. Concur—Wallach, Mazzarelli and Andrias, JJ.

Murphy, P. J., dissents in a memorandum as follows: Shortly after midnight on December 8, 1992, Police Officers Edelstein and Ahern were informed by radio transmission that two Hispanic-looking men, one shorter than the other, in dark clothes, had committed a robbery with a gun on 180th Street near Fort Washington Avenue and were running towards Broadway. Shortly thereafter, the officers observed two black men running eastward towards Broadway on the north side of 177th Street. One of these men was the defendant, dressed in a dark red plaid coat and blue jeans; his companion, shorter in height, wore black pants. Approaching the pair, the officers observed defendant carrying a folded brown leather jacket tightly under his right arm. According to Officer Edelstein's later testimony at a suppression hearing, the two men veered towards the street upon seeing the officers and were immediately apprehended. As Edelstein grabbed the defendant, he felt a bulge in the area where defendant was holding his right arm to his body—"something not square, not quite round, but large enough to be some sort of package under there". The object "felt hard and basically squarish, but [Edelstein] couldn't tell what was on the other side of the bulge[;] it could have been anything from a weapon to a knife to other * * * paraphernalia"; he "thought possibly there was a gun secreted under [defendant's] jacket". The officer opened defendant's jacket and removed an 8 inch by 5 inch zippered pouch from under defendant's right arm; he later testified that the defendant claimed to have found the pouch on the subway. Feeling something "solid, substantial" and "with some weight", and later claiming that he believed the pouch might contain a gun, Officer Edelstein opened the pouch and discovered within a wallet, credit cards, cash and a watch. Removing these items, Edelstein found in the wallet a college photo identification card of one Joshua Peller, a male Caucasian. While the victims of

the 180th Street robbery failed to identify defendant in a show-up a few moments later, Peller, contacted by police later that morning, informed police that he had been mugged in a separate incident earlier in the day, and later identified defendant, albeit somewhat tentatively, in a lineup. Following the court's denial of defendant's motion to suppress the wallet as the fruit of an illegal search, defendant pleaded guilty to robbery in the second degree and was sentenced, as a second violent felony offender, to a term of imprisonment of five to ten years.

Because both the stop and the search of the defendant were unwarranted, there should be a reversal. The information available to the officers on the scene indicated that the robbery suspects were two Hispanic men, darkly dressed, last seen fleeing towards Broadway on 180th Street, at least three city blocks away. That the pair were of differing height did not add meaningfully to this information, inasmuch as most pairings of men may be so described. In my view, this information simply did not justify the forcible stop of two black men, one of whom wore a red plaid coat, running towards Broadway on 177th Street. The ensuing search of the package beneath defendant's jacket was even less justifiable, for reasons which I have recently detailed (see, People v Reyes, 234 AD2d 63, lv granted 89 NY2d 948 [Murphy, P. J., dissenting]). I find no authority for the curious proposition that the Fourth Amendment permits the search of a package for a weapon merely because it contains something "solid" and "substantial". Officer Edelstein testified neither that the object felt like a gun, nor that he felt himself to be in danger of harm once he had retrieved the package. In any event, Officer Edelstein's search of the package extended far beyond the proper limits of a weapons search. Having ascertained by visual inspection that the pouch contained no item of danger to the officer, he had no cause for further examination. In retrospect, and especially in light of the discovery of fruits of prior criminal conduct, it may be attractive to view the police action in this matter as street-smart and expedient. Yet until it is determined by appropriate authority that the constraints of the Fourth Amendment are negligible upon our urban streets, this Court's duty is to disavow rather than to endorse such expedience. Today we fail in that duty.