OPINION OF THE COURT
 

 Smith, J.
 

 The issue on this appeal relates to the defendant’s right to be free from an illegal search and seizure (US Const 4th, 14th Amends; NY Const, art I, § 12). A police officer, after lawfully stopping a cab in which defendant was a passenger, had his suspicions aroused by his personal observation of defendant’s movements and false response to an inquiry. At this point, the officer touched defendant’s sweatshirt covering a bulletproof vest and, subsequently, discovered a weapon. Under the circumstances presented, we agree with both lower courts that the officer’s action in touching defendant’s sweatshirt was rea
 
 *652
 
 sonable. The order of the Appellate Division should be affirmed.
 

 At about 3:00 a.m., on February 20, 1992, two uniformed police officers, Officer Ronda and Officer Caban, were patrolling in a marked police car in the Bronx. Seeing a livery cab go through a red light on the Grand Concourse, the officers pulled the cab over. As the police car came to a stop, both officers noticed defendant — the sole passenger in the cab — shift from his seat behind the driver to the middle of the backseat. Defendant’s movement drew the attention of both officers who thought it was "unusual.”
 

 Although the street was brightly lit, it was 3:00 a.m. and Officer Ronda carried a flashlight. While the cab driver was handing over his paperwork, Officer Ronda shone his light into the cab, to see the occupants’ hands, paying "special attention” to defendant.
 

 Officer Ronda then noticed that defendant was "wearing a large object protruding from his chest.” Defendant wore a sweatshirt and an unbuttoned leather coat over what Officer Ronda believed to be a bulletproof vest, the outline of which was visible. Officer Ronda was familiar with the appearance of bulletproof vests because he wore one every day and had observed his fellow officers wearing them. As the officer later testified, he knew "what a vest looks like when it’s sitting up on somebody’s chest.”
 

 The rear windows of the cab were closed. Opening the cab’s left rear door, Officer Ronda leaned his head in and asked, "What do you got on there? What do you got on there?” Defendant twice replied, "I don’t have anything on.” Defendant’s evasive denials raised Officer Ronda’s suspicions since he still believed the defendant was wearing a bulletproof vest. As the officer later testified on cross-examination:
 

 "Q: It was only after touching the vest when he drops his hands that you then fear for your safety?
 

 "A: Well, it was after I asked him the questions and he said — and he said that he wasn’t wearing anything, that’s when my suspicion was arisen.”
 

 Believing that defendant was "avoiding” him, Officer Ronda then touched defendant on the chest, where he believed the bulletproof vest to be, and felt a very heavy "Kevlar” vest. At this moment, defendant "tensed up” and threw his hands to his sides with his palms down on the seat. His attention drawn
 
 *653
 
 to where the defendant had suddenly pressed his hands, Officer Ronda looked down and saw a bulge in the right-hand pocket of appellant’s leather coat which lay flush on the seat. At that point, fearing for his safety, the officer grabbed the pocket, felt a gun, and called to his partner for assistance.
 

 Officer Caban grabbed defendant’s arm while Officer Ronda removed a loaded, nickel-plated .380 caliber semiautomatic handgun from appellant’s coat pocket. It was later discovered that this same gun was the weapon used to kill Mark Santiago, a 16-year-old male, about three weeks earlier on February 1, 1992. At that time, Officers Ronda and Caban were unaware that defendant had previously been identified by two witnesses in connection with an investigation into the murder of Mark Santiago.
 

 Defendant was convicted, after a jury trial, of murder in the second degree, criminal possession of a weapon in the second degree and criminal possession of a weapon in the third degree. On appeal, the Appellate Division unanimously affirmed the conviction and held that Officer Ronda’s touching of the sweatshirt was "justified by the taxi having run a red light, defendant’s movements in the back seat, the officer’s observation that defendant appeared to be wearing a bulletproof vest, and defendant’s refusal to answer the officer’s question as to what he was wearing” (216 AD2d 174, 175). The Appellate Division also stated that defendant’s hand movements, throwing "his hands to his sides in an attempt to conceal a bulge in his coat,” gave Officer Ronda "a reasonable concern for his safety,” and thus justified the subsequent search of the defendant’s pocket (216 AD2d, at 175).
 

 The touchstone of any analysis of a governmental invasion of a citizen’s person under the "Fourth Amendment and the constitutional analogue of New York State is reasonableness.”
 
 (People v Chestnut,
 
 51 NY2d 14, 22, n 7;
 
 People v Moore,
 
 32 NY2d 67, 69.) A determination of reasonableness turns upon the facts of each case
 
 (Chestnut,
 
 51 NY2d, at 22). Since the livery cab had gone through a red light, there is no question that the stop was appropriate
 
 (People v Ingle,
 
 36 NY2d 413). Under the facts here, the frisk of the defendant was also appropriate.
 

 A "frisk,” defined as a "pat-down” of the outer clothing of a suspect, may be justified on less than what would be required for an arrest.
 
 (People v Rivera,
 
 14 NY2d 441, 446;
 
 People v Moore,
 
 32 NY2d 67, 70,
 
 supra.)
 
 As this Court explained in
 
 Rivera:
 

 
 *654
 
 "If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimize that danger.” (14 NY2d, at 446.)
 

 Yet the propriety of a frisk is not automatic. The officer must have knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety
 
 (see, People v Carney,
 
 58 NY2d 51;
 
 see also Terry v Ohio,
 
 392 US 1). The question remains whether the circumstances in this case support a reasonable suspicion that defendant was armed or dangerous. We think the lower courts were correct that they do.
 

 The facts giving rise to the constitutionally permissible intrusion by the officer are not negated by the officer’s testimony that, at the point leading up to the touching, he did not fear for his safety. As this Court noted in
 
 People v Moore:
 

 "[W]e attach no significance to the fact that at the suppression hearing the arresting officer did not articulate any feeling of fear for his own safety or for the safety of others at the time of the search. There was in this situation good cause for such fear and that alone may be sufficient in a proper case.” (32 NY2d, at 72;
 
 see also, People v Clee,
 
 89 AD2d 188, 191,
 
 appeal dismissed
 
 61 NY2d 899.)
 

 While the officer here did not indicate that he had a specific fear that the defendant was armed and dangerous, he expressly testified that he became suspicious based upon the facts he had observed.
 

 For example, the officer clearly testified that he felt that the defendant’s movement in the rear seat immediately following the traffic stop was "unusual” causing the officer to pay "attention” to defendant. When the livery cab was stopped by the police, the defendant, who was sitting in the backseat directly behind the driver, shifted over to the middle of the backseat. The officer further testified that his "suspicion was arisen” when the defendant denied that he was wearing a bulletproof vest when the officer was convinced that the opposite was true. The officer’s conclusion was based upon his years of experience
 
 *655
 
 in wearing a bulletproof vest every day and observing his fellow officers also wearing protective vests.
 

 Generally, a bulletproof vest is designed to prevent the penetration of bullets (Penal Law § 270.20 [2];
 
 cf., Linegar v Armour of Am.,
 
 909 F2d 1150, 1154 [8th Cir 1990]). Although wearing a bullet proof vest is not, itself, illegal, this Court has expressly noted the inherent linkage between a vest and possession of a firearm. In
 
 People v Smith
 
 (59 NY2d 454), we held that while defendant’s crime (passing through a subway
 
 gate
 
 without paying) "was not one suggestive of the presence of a weapon, the fact that defendant was wearing a bullet-proof vest certainly was, and was enhanced by his denial of the fact” (59 NY2d, at 459). Consequently, we held that the search of defendant’s briefcase was permissible.
 

 Although a bulletproof vest is properly linked to the inference that the wearer might be carrying a gun, more is usually required to justify a frisk of the suspect
 
 (People v De Bour,
 
 40 NY2d 210, 216 ["innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand”]). Here, the frisk was undertaken only after defendant’s unusual movement immediately following the valid traffic stop, the defendant’s evasive denials about his bulletproof vest and the officer’s observation of what his personal experience taught him was a bulletproof vest on a person.
 

 Accordingly, the order of the Appellate Division upholding the defendant’s conviction should be affirmed.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Levine and Ciparick concur.
 

 Order affirmed.